May it please the court, Marissa Conroy on behalf of the appellant Ismael Gutierrez. And I'd like to reserve two minutes of time for rebuttal, please. I'd like to begin by addressing the sentencing argument in this case. On Friday, the government submitted a 28-J to this court, essentially arguing that Pimentel-Lopez and the court's ultimate sentence in this case is not inconsistent. And that's simply incorrect. Here we had a case where the jury was submitted a special verdict made of finding beyond a reasonable doubt an affirmative finding that Mr. Gutierrez both conspired to distribute less or more than 5 grams and less than 50 grams of pure or actual meth. And the same... 87% pure. No. The jury's finding was actual or pure meth. So more than 5 and less than 50. And I can kind of back you up and tell you where that derives from. The jury convicted him of, yes, between 5 and 50 of pure or actual. That's correct. Right. And so essentially... But there was also at some point a finding that the overall amount was 55 or something like that? There was no finding. There was a stipulation by the parties at trial that the government seized on September 26th. I can read the exact stipulation. It said... 55.9, that's 87% pure. Correct. And that works out to 48.6. But the stipulation is not the same as the jury's affirmative finding beyond a reasonable doubt that this was the amount of pure or actual meth he possessed. That's the problem. And that's what binds the court and both the parties under this court's logic in Pimentel-Lopez. So under the stipulation itself, it's still under 50. Is that your argument? Well, the stipulation references 48.6 grams of pure or actual. Right. Okay. And the conversion on the mix, the 87%, would be 55.9. The problem is he was convicted based on pure or actual, which would be 48.6 grams, which results in a base offense level of 18, or excuse me, 28. Excuse me, 28. But at sentencing, the court sentenced him based on a base offense level of 30. And the reason being that the commentary to the guidelines requires that the court take whatever conversion, whether it be the pure amount or the meth mix amount, that results in the higher base offense level. And so the problem here is that's where the tension is. Application note. Well, but it's only a tension if you think that the court didn't make a finding or didn't have a basis for making a finding. That, in fact, when you take the pure amount that the jury found and the physical amount that was, in fact, seized, it was within the purity that would make it ICE. Right. But I think where the problem comes in is, yes, it is true that the commentary must be followed. It's binding. But there are exceptions, those exceptions being when it violates the Constitution. And I think here by disregarding the jury's affirmative finding beyond a reasonable bound as to the pure or actual amount of meth that was attributed to the jury. Why is it disregarding it? That's what I don't understand. Why is it disregarding it rather than taking it into account? But the jury never made an affirmative finding as to the. . . But that doesn't make it contradictory, though. It simply makes it not that the jury didn't find it, but that doesn't mean that it couldn't be found. Are you arguing that there was a contradiction? I think, in essence, it's inconsistent. Why? That's what we're not understanding. Well, essentially, when you go with the mixed level, you're at a higher base offense level, and it completely changes his sentencing guidelines starting point. So back us up through it, because it seems to me that 55.9, 87 percent pure, that gets to 48.6. As Judge Wynn said, it's under 50, right? He's between 5 and 50. But the jury's finding was as to pure, and so if you're going to simply allow the judge to find a higher. . . So don't skip over it, because we're trying to catch up with you to make sure we're not missing something, please. The jury's finding was between 5 and 50 of pure, right? Correct. Okay. Then take the next step, please. So that is what Mr. Gutierrez should be sentenced based upon. In this case, the government . . . And you think he wasn't? Suppose this had been done in a more orderly fashion than it was, and the government had come in at the sentencing hearing and said the jury found 48 whatever of pure meth, and we're going to show you, or the PSR says, and it's true, that what was actually seized was 55 milligrams, whatever we're talking about here. And therefore, if you do the percentage, it's now 87%, and that makes it ICE. You're saying the judge could not make that finding, the second finding, even if he had the right evidence for it? If he had the correct evidence, but the judge didn't make any findings. He simply adopted the PSR. Well, that's a different question. That's a different question. But it has nothing to do with there being any contradiction with what the jury found. Well, I think it ignores the jury's special verdict. It doesn't ignore it. It uses it. That's what I think. So tell us why it isn't incorporating the jury's special verdict. Because the stipulation is only as to what was seized. Mr. Gutierrez was not present at the drug transaction, and so that is not what is attributable to him, which is how the jury's verdict differs. The jury specifically affirmatively holds Mr. Gutierrez liable for 48.6 or more than 5, less than 50 grams of pure or actual meth. That's the difference. Is it an appendi-type argument that you're raising? It's not. It's more just like the court's logic in Pimentel-Lopez. When the jury makes a special verdict, an affirmative finding beyond a reasonable doubt, you have to give weight to that. You can't simply ignore it. The parties are bound by it. Here the government chose to proceed this way. They indicted on 48.6 grams. They, throughout trial, on 16 different occasions, referenced 48.6 grams. There was no reference by the government in their argument, in their closings, their summations. The problem is, of course, that it's not at all unusual for facts to be found and relied upon at the sentencing hearing that were not found by the jury because they weren't pertinent to what the jury was finding. You have a secondary argument, which is that, as I understand it, that the requisite finding wasn't actually made by the judge. I guess we can hear that, but that's why I went first to the hypothetical where he actually had the hearing and made the finding. Maybe there's a problem about whether he's made the finding, but he could make the finding. Why couldn't he? I think he could essentially make findings, but I don't think in this case he could. I think he's bound by the special verdict. So it's not just that he didn't. You think he couldn't have? In this case. In this very small, small universe of factual circumstances, I don't think he could. It was the government that proposed this verdict form. They're the ones that asked the jury to find not only the type of drug that it was met, but that it was pure and actual and what amount it was in between. And so to simply ignore or disregard that, because obviously there were no factual findings made, he's bound by that. The Court is bound by that. The parties are bound by that. There's relevant language in Pimentel-Lopez, and it says, Special findings are dispositive of the questions put to the jury. Having agreed to the questions, the government cannot now ask us to ignore the answers. To do so would be a clear violation of the Petitioner's Sixth Amendment right. And I think when you simply disregard the jury's special finding that they proposed and the Court adopted, the parties are bound by that. So that would be my argument as to why that sentence controls. Kagan. Is there a forfeiture issue here, given that this specific argument was raised in the reply brief? I don't believe so. Well, they didn't brief it in the red brief because they didn't have an opportunity to respond to it, right? Correct. But at the time the opening brief was drafted, Pimentel-Lopez had not yet been decided. So should they have an opportunity to brief it? Well, they filed a 28-J this Friday addressing why. Yes. If they wanted to, obviously. You wouldn't object, right? No, I would not object to supplemental briefing. That's all I'm finding. No. Clarify. All right. Are there other arguments? Can we go on to the questions, the main questions in the brief concerning whether there was, for two different purposes, an adequate evidence of conspiracy here? Where I'm having severe trouble with your argument was I didn't really understand why the facts were as your client was suggesting, i.e. that he was referring smaller deals to this cousin of his and that perhaps the cousin wasn't working for him, but they all seemed to be working for, quote, the same company. Why isn't that enough of a conspiracy right there? I understand that the government's theory seemed to be that your client was kind of their ringleader and that he was getting the drugs and giving them to the other guy. But suppose that wasn't true at all. Why wasn't there still a conspiracy? Well, that's not exactly how the facts played out. It was more so you have a confidential informant contacting Mr. Gutierrez repeatedly. Mr. Gutierrez is not contacting him back. And finally, when they do speak, Mr. Gutierrez is saying to him, here's a number, talk to this guy. I'm not doing that. I'm just not doing that. But they're my people and the other guy says we're all the same and we're all in the same company and finding the guy when they can't find him. In other words, it seemed to me that you were envisioning or he was envisioning that the government had approved one kind of conspiracy. But I don't know why what they approved even on your version of events still isn't a conspiracy. Well, I think the facts are being kind of, when you step back, when you go to the my people and it's okay, you have to look at that in the context of which it occurred. The first conversation it was, call this guy. And the CI responding, well, why should I call him? It's okay. He's my people. It's my nephew. Which obviously can be interpreted as simply this is my family member. You can call him. You can trust him. Okay, why isn't that a conspiracy to distribute drugs? Because there's been no agreement as to the type of drug, the quantity of drug, what's going to be. So what? Well, there needs to be some type of agreement made. And there's no agreement at that point. The agreement that seems plain is that if somebody calls me and wants to buy a little bit of drugs, I'm going to refer him to you and you're going to sell him a little bit of drugs. But I don't think that there's evidence of that in the record, that if someone calls me and wants a little, then I'll have them call you. Oh, he said that. The nephew said that. I thought that was perfectly clear. Well, there is a recording during the transaction in which whoever this person in the vehicle is, which we obviously dispute that it was even Huerta in the vehicle, is somehow implicating Mr. Gutierrez. But he does the little amounts and Gutierrez does the big amounts, right? Correct. Well, why isn't that enough? I mean, the government kind of fell into the same problem. They were trying to argue for something bigger, too, but I don't know why. I don't know why what's simply there before us isn't an adequate conspiracy to distribute drugs. Well, I think, you know, first off, there wasn't an agreement. Secondly, you make the point that Mr. Gutierrez contacted the nephew when the CI couldn't get a hold of him. I think you also need to look at the facts there. It wasn't here's my nephew's number, let's get this deal going and lined up. It was, oh, I'll have him call or I'll call him and have him call you. And it's kind of up in the air. There's no affirmative desire to push this transaction forward. It's, well, let me call him. I think your argument is a pretty tough one because had it been just a referral to the nephew, you know, I'm interested in buying drugs. Hey, I know a guy. Go ahead and go, you know, do the deal with him. That's a different case. But in this case, the CI did push back against the defendant's suggestion to deal with the nephew by saying, well, I don't really know him. You know, I want to do the transaction with you. And your client suggested, but that's the same thing. They're my people or it's the same thing because that's my nephew. So that's the link right there, isn't it? Understood. Obviously, as I mentioned in my brief, you need to look at the CI and, you know, obviously the jury didn't believe all of the CI's testimony when they acquitted on count seven. And so you have a case where the government paid $9,000 to the CI, provided him with immigration assistance, paid his parking ticket, called his finance company, and this was all over a $950 drug deal. So I think with what the CI is saying, obviously it's not for this court to find credibility, but the jury didn't necessarily believe everything the CI said. So with that, I save my one minute for rebuttal. Thank you. We'll give you two minutes when you come back. Good afternoon. May it please the Court. Kimberly Jamez on behalf of the United States. Help me understand the sentencing calculation because the probation officer had a couple of reasons why it should be an offense level 30. One is which that one is that Gutierrez was distributing ice, but he wasn't charged with distributing ice. Your Honor, that's correct. He wasn't charged with the 48.6 grams of pure methamphetamine. However, at trial, there was a stipulation to that effect. Well, the stipulation was as to what the government seized. It wasn't as to what he had, right? It's a little different. That is correct, Your Honor. The stipulation was with respect to what was seized, and then what was adduced at trial with respect to evidence presented through CI testimony as well as through testimony of other agents was that what was seized... But the jury had a specific finding of less than 50 grams, right? Between 5 and 50, right? Between 5 and 50. But with respect to a specific category under the guidelines, pure or actual methamphetamine. And now that is not contradictory to the ice finding as is evidenced by the stipulation. You can have a sample that is both at the same time 48.6 grams pure methamphetamine and simultaneously 55.9 grams ice based on the 87% pure quality. So when you look at the drug calculation table under the relevant sentencing guidelines and you calculate a sentence for meth, do you look at the weight? Because that seems to me to be what the application notes suggest, that for methamphetamine you go to the weight of the controlled substance, not the weight of the mixture. So now I'm trying to, if that's a correct reading of the guidelines, then we're just trying to figure out, well, what's the weight here, right? Well, what the application note says is interpreted by the various pieces of case law is that you need to look at the various categories and determine which one results in a higher base offense level. Well, it's not the case. I mean, it says as much in the application note. It says use the higher, whichever is higher, whichever is greater. Correct. Exactly. And so here we have two specific categories of methamphetamine that we need to consider for the sentencing, both the 80% or greater purity, which is ice, or the pure level. Now, the pure level is, in fact, the 48.6 grams, but at the same time we also have an ice quantity, which is the 55.9 grams, and they're not contradictory. It's unlike Pimitel-Lopez, which is where the court finding and the jury findings both dealt with mixture and substance of methamphetamine. It was the same category. So there you did have an instance of a direct contradiction. Here they're complementary, which is why, just as an example in the stipulation, you can stipulate to both the pure and the ice amounts. So could you go back to Judge Wynn's question since the guideline, application note B is what I'm reading from, it says to use whichever is greater, right? And so she asked you about the guideline calculation? Correct. So here we have two quantities. We have 55.9, which is ice, and then we have the 48.6 grams. And so you have to look at whichever is greater, and that is going to determine the base offense level. And that's what the probation officer did in this instance. Which was greater. Which the court, excuse me? Which was greater. What was used. I'm trying to figure out what's the calculation. The calculation in this instance was the 55.9. Thank you. As based as evidence in the PSR. So let me make sure I understand the argument that the government is making here. You're saying that at trial you proved both that the actual weight as determined by the jury is less than 50 grams of pure actual meth, but you also proved that it's over 50 grams of a mixture at more than 80 percent purity, therefore it's ice, and therefore it's level 30? That's the government's argument? The government's argument is that at trial evidence was adduced that the sample that was passed was both at the same time, based on the stipulation, 55.9 grams, of 87 percent purity ice, as well as 48.6 grams of pure methamphetamine. When that stipulation is combined with the testimony of other witnesses, it was proven at trial that the defendant was responsible for both 55.9 grams of ice as well as 48.6 grams of pure methamphetamine. But the jury never found that. So there has to have been a finding by the judge. And my question is, was there such a finding by the judge? Did the judge ever say where he got the 30 from? The judge said at the sentencing hearing that the court felt like the guidelines were correctly calculated in two separate instances, and said that the court was going to be adopting those guidelines because there were no objections by either party. The separate instances being in the pre-sentence report and where else? Two separate instances at the sentencing hearing, Your Honor. The court basically said that he was accepting the guidelines, he felt like they were properly calculated, and he also noted for the record that there were no objections to the pre-sentence report by either party. And so under the case law... Did the government argue for 30 at the sentencing hearing? Yes, Your Honor. The government argued for 30, and the defendant did not object. Why? They just said 30? 30 based on the probation officer's finding in the PSR, specifically paragraph 18. What about opposing counsel's argument that it was your proposed jury verdict for him and you have to live and die by it? Well, essentially, Your Honor, nothing in the case law says that the jury has to find the exact quantity for sentencing guideline purposes. Under Apprendi, obviously, we need a jury finding for any type of quantity that's going to trigger the mandatory minimum. But when you're looking for the relevant verdict, based offense level for guidelines, there's nothing to indicate that we need a specific jury finding. Yes, we do have this new Pimitell-Lopez case, but that's different. That is only saying that when you have a specific court finding that is directly contradictory to a jury finding on the same substance, that cannot stand. While we're at it, can I just clarify, are you requesting an opportunity to separately brief this issue? Because it was raised for the first time, given the timing of the new case law. Only if the court feels it is necessary. I do believe that the government has addressed the distinctions here. That's fine. Does the government usually charge ICE if it's going to rely on ICE in sentencing? Or do you charge, as a matter of standard practice, charge meth and then convert it to ICE if the purity level is sufficient at the time of sentencing? Your Honor, I've seen it done both ways. I think that oftentimes there's a focus on the purity levels because that is oftentimes more persuasive to a jury when you consider the pure amount of methamphetamine. However, the government does not see the decision to be determinative of what the ultimate sentence is going to be. No, I understand that. I just wonder what the practice is. Do you charge ICE if you're going to basically proceed and ask for a sentence based on ICE? Your Honor, I've seen it done both ways. May I proceed on a different point? Your time. Go right ahead. Thank you, Your Honor. Your Honor, the defendant in this case was convicted not only for his role in the discreet September 26 transaction, but he was also convicted for his role in the larger conspiracy to distribute methamphetamine. That conspiracy was the one that was alleged in Count 1 and proven at trial, and that conspiracy says that beginning on a date unknown and continuing to at least October 7, 2013, the defendant conspired with others known and unknown to the grand jury to distribute methamphetamine. That was the conspiracy that was proven at trial in addition to the discreet Count 2 substantive count of the actual distribution on September 26. It's important to draw the distinction here because many of the defendant's arguments seems to rely on this fallacy, the fiction, that the conspiracy only related to one transaction, the argument that the co-conspirator statement somehow did not directly implicate the defendant, the argument that the other act's evidence somehow was not inextricably intertwined or that Huerta was not sufficiently involved all rely on this fallacy that we have a very constrained conspiracy. Not so. It was a larger conspiracy that covered the September 26 transaction as well as the phone counts. And the evidence... As well as the, sorry, what? I'm sorry. As well as the phone counts. Thank you. And the evidence that do such trial was ample and the government cements properly admitted. We admitted evidence of the defendant's statements as evidence in recorded calls, this defendant's statements where the defendant admits or actually indicates that he's conspiring with Huerta when he refers the informant to Huerta for smaller quantities. So he says in the September 26 call, you needed a small one? Essentially asking him, did he need a small amount? And then when he found out that yes, he only needed two ounces, then the defendant went on to say, well, I'll tell him, I'll call him right now. In the October 7th call... Counsel, could you give us the record sites when you... The dates are helpful, but of course I'm doing this by the records. GER 41, Your Honor. Thank you. Okay. With respect to the October 7th call, the defendant says at the beginning when he first starts speaking to the informant, go to Huerta if you need a little bit and that's at GER 66. But then when he finds out that the informant wanted more, he actually says, yes, I'll give you warranty and everything. In addition to those very telling statements, the defendant also makes a number of other statements showing that he's involved in this conspiracy with Huerta. He reassures the informant on several occasions that he should continue on with this transaction, saying things like, they're the same, they're my people, he's my nephew, it's the same thing. In addition to the defendant's statements, another key piece of evidence is the price negotiation here. The ultimate price for the methamphetamine was $450 per ounce. That is telling because Huerta initially quoted $600 an ounce. The only way it gets back down to $450 per ounce is by the defendant's intervention, showing once again his involvement in this conspiracy. In addition, the government adduced evidence at trial in the form of the informant's testimony which was corroborated by toll records. And then, of course, there's just the mere fact that the transaction occurred, which would not have otherwise had occurred had it not been for the defendant's involvement. Now, when you consider that evidence... I'd like to interrupt you, and you're doing a very nice job, but I would like to talk a little bit about the evidentiary issues. Okay, yes, Your Honor. Because your time's running down. I must say that I was troubled, although I questioned the prejudice, by both the evidentiary issues that were raised. That is, the evidence of... rather vague evidence of Gutierrez's action with regard to some drug transactions sometime before, and the fact that Huerta, sometime after all this happened, was looking at... or somebody on a phone he had access to was looking at a narcotics website. I don't understand why either of those were admissible. I guess I'd like to know that, and if I'm right, why was there not sufficient prejudice? And just to clarify the question, it's a question with respect to the other acts evidence as well as the web searches? Both, yes, both. Your Honor, first I want to make... The other acts evidence, this was not... I mean, there is no knowledge or intent issue here as such. The issue is, was there a conspiracy? Was there an agreement as to a particular thing with a particular person? What Gutierrez did with regard to somebody else at some other time, I don't understand the relevance of it. Well, Your Honor, actually, thank you for bringing that up. With respect to the other acts evidence, I do want to make a correction in the record. The defendant in the reply brief at page 23 claimed that the government relied on the other acts evidence, the statements by defendant with respect to Nestor Hernandez. That, in fact, is not the case. If you look at the citation given by defendant at ER 513 to 514, there is no mention of those statements. All that is said is that the informant knew defendant for longer,  and the informant asked for drugs. All of that could be based on the informant's testimony, the very beginning of the informant's testimony, completely separate and apart from the other acts evidence. So I did want to clarify that, that even though it was introduced at trial, it was not emphasized in closing. But what if we think it shouldn't have been introduced? Well, the government would submit that we do believe that it was inextricably intertwined. We believe that it shows the background of the relationship between the informant and the defendant. That's really, really far-fetched. Really, really far-fetched. That's a tough sell. Understood, Your Honor. And so even if this Court were to determine that the admission of the evidence was error, the error was significantly harmless in this case. It was only 14 lines of testimony. It was not emphasized. But you know what? That's what the government always says. And if the government really overreaches, I'm really troubled by it. So what is your best argument? Because the one you're giving right now is the one that we hear every time unfairly prejudicial evidence is introduced. Your Honor, I would focus on the content and the brevity. Well, the brevity, I've already mentioned the content. The statements themselves were not emotionally inflammatory. They're not the type of statements that would stay with the jury. And when you compare those statements to all of the other evidence provided, the defendant's statements, the informant's testimony with respect to their one-on-one meeting, as well as the October 7th call, the toll records, everything else that was presented. Yes, but you do have a case here in which Harris ultimately didn't sell these drugs and kept saying, I'm not going to sell these drugs. And so now you're introducing evidence, at least in one instance, in which you did sell drugs. Right? We are, Your Honor. We're introducing evidence in which he told another to distribute drugs on his behalf. Right. And so you're filling in kind of a hole in the evidence of the present conspiracy by something that happened quite a while ago. Not with the same people and not the same conspiracy. I mean, there's no argument that that's the same conspiracy, right? Well, no, Your Honor, but we would say that the other evidence presented, which is where the defendant essentially acknowledges that he's able to distribute and willing to provide pounds of methamphetamine with warranty and everything, where we have Huerta's strong statement saying they're all part of the same company, one finger of one hand. That's much more persuasive than these 14 lines of testimony. Of course, that could mean, and maybe it did mean, we're getting it from the same person. Excuse me? We're getting the drugs from the same person. It's all the same company, meaning he gets it from this person and I get it from that person. The same company. We're all buying from Costco. We're all buying from Costco. And then there's the other one. I mean, this other thing seems even more far-fetched. This business about Huerta going to websites. And that, to me, has a First Amendment overlay. Why are you introducing evidence like that? A, it's not connected to him. B, it's after the fact. And C, it's what somebody's doing on the Internet. Well, Your Honor, we would submit that it does tend to show, even though it's not the most persuasive evidence. What does it show? I don't know what it shows. It tends to show that someone who was using the phone. Someone. Someone who was using the phone, a phone that was used to coordinate on the day of the September 26th transaction with someone who was interested and probably involved in narcotics trafficking, which tended to show, when combined with evidence on the phone connecting it to Huerta, that it was Huerta who was involved with narcotics trafficking. It was not the most persuasive. And, therefore, what does that prove in convicting Coteras? Admittedly, it was not the most persuasive evidence. It's overkill. You didn't need it. You're hearing overkill. You're hearing overreach. You're getting the message. Definitely, Your Honor. It wasn't necessary in this case. It was not necessary. Why does the government do this? However, the defendant didn't object. Defendant had an opportunity to cross examine and did. Counsel, you know, we really take it seriously that we hold the government to a higher burden. And your presentation today is really excellent. I can see that you take that very seriously. But I hope you get this message. Yes, Your Honor. Yes, we do, Your Honor. Can I ask you the sample that was purchased? Was that in crystal form? It was a crystal form called pink champagne, if that helps the Court, yes, when it was eventually turned over to us, though it was processed and smashed down because it had been tested. I think I interrupted Judge Berzon. Did you have another question, Judge? No, no, I did not. I think my time is just about up. The other one point that I did want to note for the Court, however, is that there are repetitive mentions of Dinah Rodriguez in the papers. And I would just note for the Court that there was absolutely no testimony, no evidence adduced at trial with respect to Dinah Rodriguez, and therefore it should not be considered. Okay. You're significantly over your time. Thank you, Your Honor. Thank you. Could you put, you've got two minutes on the clock, but could you put three minutes because we went over. Thank you. Go ahead, please. Thank you. I can just very briefly make two points. One, looking at the evidence that was adduced at trial, the narcotrafficking blogs and the prior drug transactions, standing alone, maybe it's not enough to warrant reversal. We would ask this Court to reverse based on the cumulative effect of the error in light of the evidence. And then secondly, as Judge Wynn mentioned, the government could have charged ICE and mix, and they didn't. And the government could have proposed a special verdict for ICE and a meth mix, and they didn't. And we're asking this Court to enforce that special verdict. Thank you. Now are we done? Yes. Okay, great. We're done. Thank you so much. We'll stand and recess.
judges: Berzon, Christen, Nguyen